

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 22, 2025**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-41656-ELM |
| JAMES VARGA, | § | |
| | § | Chapter 7 |
| _____Debtor._____ | § | |
| | § | |
| LISA L. LAMBERT, United States | § | |
| Trustee for Region 6, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 21-04083 |
| | § | |
| JAMES VARGA, III, | § | |
| | § | |
| _____Defendant._____ | § | |

## <u>MEMORANDUM OPINION</u>

In this adversary proceeding, Plaintiff Lisa L. Lambert (the "**U.S. Trustee**"), the United

States Trustee for the region covering this district, objects to the issuance of a chapter 7 discharge

to Defendant James Varga, III (the "**Debtor**"), the debtor in Case No. 21–41656 (the "**Bankruptcy**

Case").[1]  Specifically, the U.S. Trustee objects to the Debtor's discharge (a) pursuant to section 727(a)(4)(A) of the Bankruptcy Code,[2] alleging that the Debtor knowingly and fraudulently made false statements under oath in his petition, schedules, statement of current monthly income, and original and amended statement of financial affairs, and at the section 341 meeting of creditors and Bankruptcy Rule 2004 examination conducted in the Bankruptcy Case, and (b) pursuant to section 727(a)(2) of the Bankruptcy Code,[3] alleging that the Debtor concealed assets within one year prior to filing the Bankruptcy Case with the intent to hinder, delay, or defraud his creditors, and during the Bankruptcy Case with the intent to hinder, delay, or defraud his creditors and the chapter 7 trustee.[4]

While the Debtor admits in his Answer[5] to having initially provided certain inaccurate disclosures, he contends that he neither intended to fraudulently misrepresent any information nor intended to hinder, delay, or defraud any of his creditors or the chapter 7 trustee.  Instead, the Debtor asserts that the inaccuracies are attributable to the actions and advice of his previous bankruptcy counsel who handled preparation of the Debtor's initial bankruptcy filings based upon information provided by the Debtor.

Having now considered the Complaint, the Answer, the parties' Joint Stipulations,[6] the parties' other pretrial submissions,[7] the evidence presented at trial, and the representations and arguments of counsel at trial, the Court issues its findings of fact and conclusions of law pursuant

---

[1] *See* Docket No. 1 (the "**Complaint**").

[2] *See* 11 U.S.C. § 727(a)(4)(A).

[3] *See id*. § 727(a)(2).

[4] *See* Complaint ¶¶ 61-101.

[5] *See* Docket No. 15 (the "**Answer**").

[6] *See* Docket No. 27 (the parties' *Proposed Joint Pre-Trial Order*, referred to herein as the "**PTO**") ¶¶ 25-93 (the "**Joint Stipulations**"); *see also* Docket No. 30 (order approving and adopting PTO in all respects).

[7] *See* Docket Nos. 23 and 33.

to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Federal Rule

of Bankruptcy Procedure 7052.[8]

### JURISDICTION

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and

157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings*

*Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).   Venue of the proceeding in the Northern District of

Texas is proper under 28 U.S.C. § 1409.   The proceeding is a core proceeding within the meaning

of 28 U.S.C. § 157(b)(2)(J).

### FACTUAL BACKGROUND

#### A.    The Debtor's Prepetition Involvement in the Real Estate Market

The Debtor grew up in Phoenix, Arizona.   After completing the 11th grade of high school,

the Debtor dropped out of school to assist his father in the produce business.[9]   Later, the Debtor

had the opportunity get involved in construction work.[10]   It was during this time frame that the

Debtor developed a passion for real estate.

In 1983, the Debtor moved to Fort Worth, Texas.   Since roughly 2002 or 2003, the Debtor

has been involved in the real estate market.[11]   Initially, from roughly 2003 until 2008, the Debtor

worked as a mortgage broker.[12]   During this time frame, the Debtor obtained the required mortgage

broker license to handle mortgages for owner-occupied properties.[13]   He also held a Group 1 health

---

[8] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include
any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law
are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

[9] *See* Exh. UST-12 ("**2004 Exam Transcript**"), at p.7.

[10] *See id.*

[11] *See id.*, at p. 8.

[12] *See id.*

[13] *See id.* at p.9.

insurance license.[14]  Both licenses required, though study and testing, a demonstrated ability to comprehend complex financial issues and to practically apply them to real life situations.

By as early as 2004, the Debtor began to explore real estate development opportunities.[15] For his first significant real estate development project, the Debtor partnered with several others on an 18-condo renovation project on the east side of Fort Worth, Texas.[16]  The Debtor's role was to assist the owner and contractor in raising investment money to do the rehabilitation work, and then once completed, to help the owner lease units to raise sufficient rental income to refinance the investments for a five- to seven-year holding period before resale.[17]  This experience ultimately led to the Debtor pursuing larger projects of his own.

In particular, in or around 2017, prior to his bankruptcy filing on July 13, 2021 (the "**Petition Date**"), the Debtor organized a group of real estate investment and development companies to be used to raise capital – much of it from individuals – for various real estate projects (collectively, the "**PWB Companies**").[18]  Partners W/Benefits, LLC ("**PWB**"), of which the Debtor was a member, served as the holding or umbrella company for the PWB Companies.[19] Among the PWB Companies were the following entities:

Partners W/Benefits Property Group, LLC ("**PWB Property Group**"): PWB Property Group was established to acquire properties at a discount that needed rehabilitation, to provide accurate property revaluations, and to engage in related business.[20]

---

[14] *See id.*

[15] *See id.*, at p.11.

[16] *See id.*

[17] *See id.*, at pp.11-12.

[18] Joint Stipulations ¶¶ 50-51.

[19] Joint Stipulations ¶ 52.

[20] Joint Stipulations ¶ 53.

Partners W/Benefits Lending, LLC ("**PWB Lending**"): PWB Lending brought loan programs to clients for real property rehabilitation, rental properties, and "cashouts" to expand their real estate portfolios.[21]

R3 ResiCom Development & Construction, LLC ("**R3 ResiCom**"): R3 ResiCom provided project management services.[22]

Regal REI Services, LLC ("**Regal REI**"): Regal REI was intended to hold real estate investments.[23]

With the Debtor serving as the CEO and main decision maker of PWB, the PWB Companies financed, marketed, and managed real estate development and investment opportunities.

The primary opportunity offered to interested parties was a joint venture investment opportunity, whereby PWB would partner with the investor on the acquisition, renovation, and resale of a property.  As explained in PWB literature provided to potentially interested investor parties:[24]

PWB Companies are a group of companies under the PWB umbrella that specialize[ ] in Real Estate Investments and Renovations.

…

One of PWB's programs is our **Joint-Venture-Partnership-Program**.  The JVPP allows investors that want to invest in real estate and might not have the time, knowledge and experience to accomplish all that goes into Real Estate Investing (locating, acquisition, renovations, building, sales and holding, exit strategies, etc.) [to] profit.  PWB JVPP partners with an investor by sharing in the costs of acquiring, renovation and preparing the property for resale, investor mortgage or rental portfolio.  The percentage share of profits in the JVPP depends upon the property and investment each party brings.  ***All investments are backed by real estate warranty deeds***.  Returns in many cases can be in the double-digit range.

Our founder and CEO, Jimmy Varga, has been in the industry since 2000.  The experience and knowledge gained over the several hundred projects in the real estate market (including construction, business development, marketing, sales and negotiations) has allowed him to develop the companies mentioned herein to drive

---

[21] Joint Stipulations ¶ 54.

[22] Joint Stipulations ¶ 55.

[23] Joint Stipulations ¶ 56.

[24] *See* Exh. UST-26 (emphasis in orig.); *see also* Exh. UST-27 ("What does it mean to be a PWB Partner?" flyer).

bottom-line profits for its partners, while reestablishing communities throughout DFW one home at a time.

PWB also offered to interested investors the opportunity to participate in "credit line programs" whereby, instead of joint venturing on a project, an investor could serve as a financing party to either PWB (in connection with its acquisition of properties) or R3 ResiCom (in connection with its renovation project management services).[25]

The Debtor was very successful in raising investment funds through the various PWB programs. By 2019, PWB owned a majority equity stake in a real estate portfolio having a market value in excess of $3 million.[26]

**B.**    ***The Debtor's Real Estate Empire Falls Apart***

By the end of 2019, as the real estate market began to cool and project delays increased, cracks began to emerge in the Debtor's investment model. In 2019, alone, the Debtor reported $153,735 in business losses connected to PWB.[27]

In an effort to initially shore up PWB's finances, the Debtor rolled out a direct investment opportunity in PWB.[28] Thereafter, in 2020, the Debtor also organized We're Home Real Estate Holdings, LLC (**"WHRH"**), a sister company of PWB, through which new investment funds would be raised to refinance certain of the debt of PWB and the PWB Companies.[29] In soliciting new investors, the Debtor, among other things, highlighted the 20 different projects that were already in play and that would proceed with the additional funding.[30]

---

[25] *See* Exh. UST-27 (discussing PWB Credit Line and R3 ResiCom Credit Line programs).

[26] *See* Exh. UST-28 (investor update in which the Debtor disclosed that "PWB owns a majority equity share in the real estate portfolio with a current market value of $3,140,382.00").

[27] *See* Exh. UST-36, at p.5 (2019 federal income tax return).

[28] *See* Exh. UST-28 ("PWB Principal Equity Sale for Capital Raise" investor update).

[29] *See* Exh. UST-29 ("GAP Loan Request – Operating and Construction Bridge Funds" investment solicitation letter).

[30] *See id.*

Ultimately, with the onset of the Covid-19 pandemic, however, the Debtor's continuing efforts to secure additional funding for the businesses stalled out. The global pandemic spooked investors and the institutional funds and individual investors who had previously loaned money to the PWB Companies were no longer able or willing to contribute additional capital going forward. Thus, as project loans began to come due and there was no new money to pay them off, lenders began to pursue collection against the underlying project assets. Accordingly to the Debtor, PWB, PWB Property Group, R3 ResiCom, and PWB-PG-IHG, LLC all became insolvent in June of 2020 when "assets and investment properties were foreclosed and taken back by 1st Lien Holders."[31]

As the PWB business enterprise began to crumble, investors correspondingly incurred material losses as well.[32] This, then, led to the onset of litigation by investors, as they attempted to recoup their losses from the Debtor and the affiliated PWB companies. In 2020, for example, the following cases were filed in Texas state court: (a) *David Mudd, et al. v. Jimmy Varga, III, et al.*, Cause No. 017-319775-20, 17th Judicial District Court, Tarrant County, Texas (the "**Mudd Case**");[33] and (b) *Mary Frosto, et al. v. James Varga, III, et al.*, Cause No. 352-317210-20, 352nd Judicial District Court, Tarrant County, Texas (the "**Frosto Case**").[34]

## C.    *The Debtor Prepares for Bankruptcy*

For the Debtor, individually, not only was he suffering losses in relation to his investment in PWB, but he also faced personal liability on the joint loans that he had signed on to, and the personal guarantees that he had provided, in relation to various PWB projects.[35] Consequently, on

---

[31] *See* Defendant Exh. D, at p.1.

[32] *See, e.g.*, Exh. UST-17 (the "**First 341 Meeting Transcript**"), at pp.26-27 (discussing one investor, Capstone Capital Partners, LLC, who suffered in excess of $4.5 million in losses as a result of the PWB Companies' failure and loan defaults).

[33] The Court takes judicial notice of the Mudd Case docket.

[34] The Court takes judicial notice of the Frosto Case docket.

[35] *See* 2004 Exam Transcript, at p.51.

the advice of counsel, the Debtor began to prepare for a bankruptcy filing, with the objective of obtaining a discharge of his debts and protecting his remaining assets.

### 1.    *The Debtor's Equity Interests in Owned LLCs and Closed Businesses*

As part of any bankruptcy planning process, it is important to be prepared to disclose all assets, including all equity interests owned in business entities.  With this in mind, among the assets owned by the Debtor as of the bankruptcy filing were the Debtor's ownership interests (collectively, the "**Equity Interests**") in each of the following companies (collectively, the "**Owned LLCs**"):[36]

> Como-Lake VS PWB-PG, LLC (100%)
> Keep Calm Naturally Healing LLC (100%)
> Keep Calm Water Supply LLC (100%)
> Keep Calm, Heavenly Spa LLC f/k/a CBD Heavenly Spa, LLC (100%)
> Lake Como Center LLC (100%)
> Linwood Townhomes Community LLC (100%)
> PWB (100%)
> PWB Property Group (100%)
> PWB Texas Property Group LLC f/k/a PWB-IHG Benefit Assurance LLC (25%)
> WHRH (100%)
> We're Home Staging & Décor LLC (100%)

Importantly, even if a debtor no longer has an ownership interest in a business because the business has been formally wound up, and even if a business in which the debtor has an ownership interest has stopped operating, a debtor also needs to be prepared to disclose all business interests owned within four years of the bankruptcy filing.  Thus, with that in mind, the Debtor owned Equity Interests in the following additional companies that were "closed" within four years of the bankruptcy filing (collectively, the "**Closed Businesses**"):[37]

---

[36] *See* Defendant Exh. I (Amended Schedule A/B), at p.6 (response to Question 19); *see also* Exh. UST-13, at pp.10-14 (response to Question 27 of SOFA, listing LLCs in which the Debtor was a member).

[37] *See id.*

> ATT Medical-HAM, LLC (100%)
> Community of Three Oaks (100%)
> Como-Lake Residents Fund (100%)
> Partners W/Benefit Investment Holding Group LLC (100%)
> PWB Development & Construction Services LLC (100%)
> PWB Development Corp. (100%)
> PWB Development Fund LLC (100%)
> PWB HRLS-HAM LLC (100%)
> PWB Lending (100%)
> PWG-PG-IHG (100%)
> R3 ResiCom (100%)
> Regal REI (100%)
> Sparkit Marketing & Consulting, LLC (100%)

One additional entity must be addressed: Sparkit! Sales & Marketing Agency, LLC ("**Sparkit!**"). With respect to Sparkit!, several layers of conflicting evidence was presented at trial. First, while the parties stipulated that "[a]ccording to the Texas Secretary of State, Sparkit! [ ] was formed January 22, 2021 with … Mr. Varga as the registered member,"[38] the actual Certificate of Formation filed with the Secretary of State indicates otherwise. It only indicates that Sparkit! was organized as a manager-managed limited liability company with the Debtor appointed to serve as the initial *manager*.[39] Nowhere within the Certificate of Formation is there a reference to any *members* of Sparkit! Second, while the Debtor asserted that he had never been a member of Sparkit! and that Isabel Portillo was the only member of the company,[40] in his Second Amended SOFA (as defined below), he curiously identified Sparkit! as an entity in which he was both a member and a managing executive.[41] Finally, the parties stipulated to the following confusing testimony provided by the Debtor during the 2004 Exam (as defined below):[42]

> Well, I was the registered agent to help [Isabel Portillo] open the company. Okay. At the registered level. And then I'm just like a 1099 if I can go out and, you know, help her get any business or anything I get a small commission. And it was really

---

[38] Joint Stipulations ¶ 67.
[39] *See* Defendant Exh. H (Certificate of Formation).
[40] *See, e.g.*, 2004 Exam Transcript, at pp.133-34; Defendant Exh. I, Schedule A/B, at p.6.
[41] *See* Defendant Exh. J, at p.12 (response to Question 27).
[42] Joint Stipulations ¶ 71.

opened to where she was going to try to go into the construction cleanup arena, doing new construction cleanup, but then she changed her mind.

Having considered the foregoing, the Court finds that insufficient evidence has been presented to establish the Debtor owned an Equity Interest in Sparkit! as of the Petition Date.

> ### 2. *The Debtor's Control of Managed Companies*

It is also important for a debtor to be prepared to disclose all positions of control in relation to business entities. Leading up to the Debtor's bankruptcy filing, there were a multitude of companies with respect to which the Debtor held a position of control. According to state business filings, the Debtor served as a manager or agent for each of the following limited liability companies (collectively, the "**Managed Companies**"):[43]

> ATT Medical-HAM, LLC
> CBD Heavenly Spa, LLC a/k/a Keep Calm, Heavenly Spa LLC
> Community of Three Oaks, LLC
> Como-Lake Residence Fund, LLC
> Como-Lake VS PWB-PG, LLC
> Keep Calm Naturally Hearing, LLC
> Keep Calm Water Supply, LLC
> Lake Como Center, LLC
> Linwood Townhomes Community
> Partners W/Benefits Inv. Holdings, LLC
> PWB Development & Construction, LLC
> PWB Development Fund, LLC
> PWB HRLS-HAM, LLC
> PWG-IHG Benefit Assurance, LLC
> PWG-PG-IHG, LLC
> R3 ResiCom Developments & Construction, LLC
> Regal REI Services, LLC
> Sparkit Marketing & Consulting, LLC
> Texas Trip Aim Holding Group, LLC
> We're Home Staging and Décor, LLC
> Partners W/Benefits Property Group, LLC
> Sparkit! Sales & Marketing Agency, LLC

---

[43] Joint Stipulations ¶ 57.

### 3.    The Debtor's Prepetition Income

As part of any bankruptcy planning process, it is also important for a debtor to be prepared to disclose current and historical income.  With this in mind:

2019 Income: For year 2019, the Debtor had gross income from wages and commissions of $135,000.[44]

2020 Income: For year 2020, the Debtor had gross income from wages and commission of $27,274.50 ("**2020 Wages/Commission**")[45] and $19,416 in unemployment income ("**2020 Unemployment Income**").[46]

2021 Income (through Petition Date):  For year 2021 (for the period January 1, 2021 through the Petition Date), the Debtor had gross income from wags and commissions of $16,311.61 ("**2021 Wages/Commissions**")[47] and $28,638 in unemployment income ("**2021 Unemployment Income**").[48]

### 4.    The Debtor's Engagement of, and Planning with, Bankruptcy Counsel

On or about May 16, 2021, the Debtor retained the law firm Bailey & Galyen, P.C. ("**B&G**") to serve as his bankruptcy counsel.  Richard F. Tallini ("**Tallini**"), an attorney with B&G, served as the Debtor's lead lawyer in the engagement.  To memorialize the terms of the engagement, the Debtor and B&G entered into a Client Employment and Fee Agreement (Bankruptcy Chapter 7 or 13) (the "**Retention Agreement**").[49]  Pursuant to the Retention Agreement, the Debtor confirmed that he understood and agreed "to provide all the information to

---

[44] See Exh. UST-36 (2019 federal income tax return); *see also* Defendant Exh. J (Second Amended SOFA), at p.2 (response to Question 4).

[45] *See* Defendant Exh. J (Second Amended SOFA), at p.2 (response to Question 4); *see also* Exh. UST-23 (2020 federal income tax return).

[46] *See* Defendant Exh. J (Second Amended SOFA), at p.2 (response to Question 5).

[47] *See id.* (response to Question 4); *see also* Exh. UST-30 (account statements for Debtor's personal checking account at Prosperity Bank (account ending in 7373), evidencing multiple transfers in for, among other things, JV commissions); Joint Stipulations ¶ 76; 2004 Exam Transcript, at pp.17-18 (discussing "side jobs" performed by the Debtor).

[48] *See* Defendant Exh. J (Second Amended SOFA), at p.2 (response to Question 5).

[49] *See* Defendant Exh. A (Retention Agreement).

the Law Firm to prepare the case."[50]   He also promised "to provide, verify, and cross check all

creditors listed on the bankruptcy paperwork."[51]   Additionally, he promised "to provide a complete

list of all of [his] assets, income, and expenses."[52]   To ensure that these requirements were both

read and understood by the Debtor, B&G required the Debtor to, and the Debtor did, place his

initials next to each of these requirements in the Retention Agreement (in addition to signing the

Retention Agreement).[53]

   Thereafter, to assist the Debtor in compiling and providing the information necessary for

the filing, B&G provided the Debtor with a Bankruptcy Client Workbook (the "**Pre-Filing**

**Workbook**").[54]   Importantly, the Pre-Filing Workbook included the following cautionary note in

bold and underlined language: "***IMPORTANCE OF THIS PACKET: … We only review the***

***information in the packet that you filled out.  We rely entirely on you doing a complete job on***

***the packet***."[55]   Certain of the responses provided by the Debtor within the Pre-Filing Workbook

are worth note:

> <u>*Ownership Interest in Business Entities*</u>: In response to the question of whether the
> Debtor owned any stock or interests in partnerships, the Debtor responded "N/A."[56]
> In response to the question of whether the Debtor owns or owned within the last 6
> years a business, the Debtor responded "Businesses are all closed" without
> identifying any businesses.[57]   In response to the question about other personal
> property owned, the Debtor did not identify any owned businesses or business
> ownership interests.[58]

---

[50] *Id.* ¶ 10.

[51] *Id.* ¶ 15.

[52] *Id.* ¶ 16.

[53] *See id.* ¶¶ 10, 15 and 16.

[54] *See* Defendant Exh. G (Pre-Filing Workbook).

[55] *See id.*, at p.2 ¶ 10 (emphasis in orig.).

[56] *See id.*, at pp.14-15.

[57] *See id.*, at p.25.

[58] *See id.*, at p.17.

*Self-Employment*: In response to the question of whether the Debtor was self-employed, the Debtor responded that he was self-employed until June 3, 2020, listing the business names as Partners W/Benefits, LLC, PWB Property Group, LLC, and We're Home Real Estate Holdings, LLC.  In response to the request for an address and phone number, the Debtor responded that such information did not exist because "all companies closed and insolvent."[59]

*Income*:  In response to the question about gross income before taxes for the years 2019, 2020, and year-to-date 2021, the Debtor listed $135,000 for 2021, $7,916 for 2020, and "N/A" for year-to-date 2021.[60]  In response to the question about non-employment income received in 2019, 2020, and 2021, the Debtor listed "N/A" for 2019, $7,916 for 2020 (identifying TWC Unemployment), and $16,994 for 2021 (identifying TWC Unemployment).[61]

*Lawsuits*: In response to the question about pending lawsuits, the Debtor only identified a case involving Wells Fargo.[62]

## D.    *The Debtor Files for Bankruptcy Relief*

On July 13, 2021 (the Petition Date), the Debtor commenced the Bankruptcy Case with the filing of his voluntary petition for relief under chapter 7 of the Bankruptcy Code (the "**Petition**").[63] While the Debtor was married to Bridget Varga as of the Petition Date, she did not file for bankruptcy protection along with the Debtor.[64]

Pursuant to the Petition, the Debtor disclosed that the estimated value of all of his assets as of the Petition Date ranged from $0-$50,000.[65]  As relevant to such disclosure, the Debtor and his wife had neither entered into a pre-marital agreement with respect to the disposition of their respective pre-marital assets nor a post-marital agreement with respect to the division of their

---

[59] *See id.*, at p.7.

[60] *See id.*, at p.18.

[61] *See id.*

[62] *See id.*, at p.20.

[63] *See* Exh. UST-1 (Petition).

[64] *See* Petition; *see also* 2004 Exam Transcript, at p.18.

[65] *See* Petition, at p.6 (Part 6, response to Question 19).

marital assets.[66]  With respect to debts owed, the Debtor estimated his liabilities as of the Petition

Date to range from $10 million to $50 million.[67]  The Debtor further indicated that his debts were

primarily consumer debts as opposed to business debts.[68]  For guidance, the Petition explained that

a "consumer debt" is defined as a debt "incurred by an individual primarily for a personal, family,

or household purpose," whereas a "business debt" was one "incurred to obtain money for a

business or investment or through the operation of the business or investment."[69]

The Debtor signed the Petition under oath, declaring that "I have examined this petition,

and I declare under penalty of perjury that the information provided is true and correct."[70]  Tallini

signed the Petition as the Debtor's bankruptcy counsel.[71]

On the same date as the bankruptcy filing, the Court entered a *Notice of Chapter 7
Bankruptcy Case* which, among other things, provided notice of a deadline of October 12, 2021,

for the filing of objections to the Debtor's discharge.[72]  By order of the Court, the objection

deadline was later extended until December 21, 2021 (the "**Discharge Objection Deadline**").[73]

---

[66] *See* 2004 Exam Transcript, at p.19.

[67] *See* Petition, at p.6 (Part 6, response to Question 20).

[68] *See id.* (Part 6, response to Question 16).

[69] *See id.* (Part 6, instructions for Questions 16a. and 16b.).

[70] *See* Petition, at p.7; *see also* Joint Stipulations ¶ 41.

[71] *See* Petition, at p.8; *see also* Joint Stipulations ¶ 37.

[72] *See* Bankruptcy Case Docket No. 5.

[73] *See* Bankruptcy Case Docket No. 36; *see also* Joint Stipulations ¶ 39.

E.      *The Debtor's Initial Sworn Disclosures*

1.      *The Original Schedules*

Among the filings required of a debtor are schedules (the "**Schedules**") of assets, liabilities, and co-debtors, which must be filed by the debtor within fourteen (14) days after the commencement of the case.[74]

After obtaining an extension of time to file his Schedules,[75] on August 4, 2021, the Debtor filed his original Schedules in the Bankruptcy Case (the "**Original Schedules**").[76]  Along with the Original Schedules, the Debtor signed and filed his *Declaration About an Individual Debtor's Schedules*, pursuant to which the Debtor affirmed the following: "[u]nder penalty of perjury, I decare that I have read the summary and schedules filed with this declaration and that they are true and correct."[77]

### (a) Business Ownership (Schedule A/B Questions 19 and 44)

Schedule A/B of the Schedules is designed to obtain a debtor's disclosure of all owned assets, both tangible and intangible.  In the Original Schedules, the Debtor disclosed that the total value of all personal property owned by the Debtor as of the Petition Date was $92,140.[78]  Over $77,000 of such amount was attributable to various vehicles.[79]

With respect to the ownership of businesses and interests in businesses, Question 19 of Schedule A/B requires a debtor to disclose the debtor's ownership in all non-publicly traded stock and interests in incorporated and unincorporated businesses, including interests in LLCs,

---

[74] *See* 11 U.S.C. § 521(a)(1)(B)(i); Fed. R. Bankr. P. 1007(b)(1)(A) and (c)(1).

[75] *See* Exh. UST-3.

[76] *See* Exh. UST-6 (Original Schedules).

[77] *See* Exh. UST-4; *see also* Joint Stipulations ¶ 42.

[78] *See* Joint Stipulations ¶ 46.

[79] *See* Original Schedules, at pp.2-3.

partnerships, and joint ventures.[80]  Question 44 of the Schedule A/B requires a debtor to disclose

any business-related property not listed elsewhere.[81]

In response to Question 19, the Debtor affirmed that he owned no stock and no interests in

any incorporated or unincorporated businesses, including LLCs, partnerships, and joint ventures.[82]

In response to Question 44, the Debtor affirmed that he owned no other business-related property.[83]

In other words, the Debtor failed to disclose any of the Equity Interests that he held in any of the

Owned LLCs.[84]

### (b) Co-Debtors (Schedule H)

On Schedules D and E/F of the Original Schedules, the Debtor scheduled $414,801.00 in

secured claims and $13,633,374.74 in non-priority (general) unsecured claims.[85]  The Debtor

incurred the majority of the non-priority (general) unsecured claims through his real estate

businesses.[86]  Schedule H is designed to obtain a debtor's disclosure of all people and entities who

are also liable for any debts of the debtor.  This is important because the bankruptcy estate may

hold certain contribution claims/rights against the co-debtors and may hold certain defenses to

claims on which the debtor and co-debtor are jointly liable.

While Schedule H instructs a debtor to "[b]e as complete and accurate as possible," and

while the Debtor was encouraged to pursue bankruptcy protection on account of the Debtor's

personal guarantees and joint liability on real estate investment obligations, the Debtor disclosed

---

[80] *See id.*, at p.5 (Schedule A/B Question 19).

[81] *See id*. (Schedule A/B Question 44).

[82] *See id.*, at pp.5 and 7 (responses to Schedule A/B Questions 19 and 42).

[83] *See id*., at p.7 (response to Schedule A/B Question 44).

[84] *See also* Joint Stipulations ¶ 58.

[85] *See* Joint Stipulations ¶ 47; *see also* Original Schedules (Schedules D and E/F).

[86] *See* Joint Stipulations ¶ 49.

no limited liability companies or any other businesses as co-debtors on Schedule H of the Original Schedules.[87]  The Debtor only disclosed his wife was a co-debtor on certain scheduled liabilities.

### 2. *The Statement of Current Monthly Income*

Another filing required of a debtor is a statement of current monthly income, which must also be filed by the debtor within fourteen (14) days after the commencement of the case.[88]  This statement requires, among other things, the disclosure of the average monthly income received from all sources during the six (6) full months prior to the bankruptcy filing.[89]  Such disclosure serves multiple purposes, among them to assess whether the pursuit of relief under chapter 7 of the Bankruptcy Code was presumptively abusive under the means test.[90]

After obtaining an extension of time to file his statement of current monthly income,[91] on August 4, 2021, the Debtor filed the statement in the Bankruptcy Case (the "**CMI Statement**").[92]  In signing the CMI Statement, the Debtor "declare[d] under penalty of perjury that the information on this statement and in any attachments is true and correct."[93]

Pursuant to the CMI Statement, the Debtor affirmed that he had no income during the six-month period preceding the Petition Date other than unemployment income.[94]  In other words, the Debtor failed to disclose any of the 2021 Wages/Commissions received during such period.

---

[87] *See* Original Schedules, at pp.83-109; *see also* Joint Stipulations ¶ 59.

[88] *See* Fed. R. Bankr. P. 1007(b)(4)(A) and (c)(1).

[89] *See* Exh. UST-5, at p.1.

[90] *See* 11 U.S.C. § 707(b)(2).

[91] *See* Exh. UST-3.

[92] *See* Exh. UST-5 (CMI Statement).

[93] *See id.*, at p.3; *see also* Joint Stipulations ¶ 45.

[94] *See* CMI Statement, at pp.1-3; *see also* Joint Stipulations ¶ 73.

### 3. *The Original SOFA*

The Statement of Financial Affairs (the "**SOFA**") is designed to, among other things, obtain a debtor's disclosure of prepetition income, any voluntary or involuntary prepetition transfers of assets, the location of property held in storage or elsewhere, and the debtor's ownership and control of businesses. After obtaining an extension of time to file his SOFA,[95] on August 4, 2021, the Debtor filed his original SOFA in the Bankruptcy Case (the "**Original SOFA**").[96] In signing the Original SOFA, the Debtor verified that "I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that answers are true and correct."[97]

### (a) *Prepetition Income (SOFA Questions 4 and 5)*

Question 4 of the SOFA requires a debtor's disclosure of the debtor's income from employment and from operating a business during the year of the bankruptcy filing and during the two previous calendar years.[98] It instructs the debtor to fill in the total amount of income from all jobs and all businesses, including part-time activities.[99] Question 5 of the SOFA requires a debtor's disclosure of all other forms of income during the same time frame, and instructs a debtor to include the income regardless of whether it is taxable.[100]

---

[95] *See* Exh. UST-3.

[96] *See* Exh. UST-7 (Original SOFA).

[97] *See* Original SOFA, at p.9; *see also* Joint Stipulations ¶ 43.

[98] *See id.*, at p.1 (Question 4).

[99] *See id.*

[100] *See id.*, at p.2 (Question 5).

In response to Questions 4 and 5, the Debtor disclosed the following income for calendar years 2019 and 2020, and for the period January 1, 2021 through July 13, 2021 (the Petition Date):[101]

| Period | Wages, Commissions, Bonuses, Tips (Q4) | Operating a Business (Q4) | All Other Sources (Q5) |
|---|---|---|---|
| 1/1/2021 – 7/13/2021 | $0 | $0 | $16,944 |
| 2020 | $7,916 | $0 | $7,916 |
| 2019 | $135,000 | $0 | $0 |

As reflected by the above summary, for calendar year 2020, the Debtor understated the total amount of 2020 Unemployment Income received and failed to disclose any of the 2020 Wages/Commissions.  For the stub-period of 2021, the Debtor understated the total amount of 2021 Unemployment Income received and failed to disclose any of the 2021 Wages/Commissions.[102]

### (b) Primary Nature of Debts (SOFA Question 6)

Question 6 of the SOFA requires a debtor to disclose whether the debtor's prepetition debts are primarily consumer or business debts by affirmatively indicating if the debts are primarily consumer debts.[103]  Despite the fact that the majority of the Debtor's roughly $13.6 million in non-priority (general) unsecured claims were incurred through his real estate businesses,[104] the Debtor responded to Question 6 by indicating that his debts were primarily consumer debts.[105]

---

[101] *See* Original SOFA, at pp.1–2 (responses to Questions 4 and 5).

[102] *See also* Joint Stipulations ¶¶ 74 and 78-79.

[103] *See* Original SOFA, at p.3 (Question 6).

[104] *See* Joint Stipulations ¶¶ 47 and 49.

[105] *See* Original SOFA, at p.3 (response to Question 6).

### (c) Prepetition Legal Actions (SOFA Question 9)

Question 9 of the SOFA requires a debtor to disclose whether the debtor was a party to any lawsuit, court action, or administrative proceeding pending within one (1) year of the bankruptcy filing.[106]

In response to Question 9, the Debtor disclosed only one case – a case involving Wells Fargo.[107]  The Debtor did not disclose any other lawsuits, including, without limitation, the Mudd Case and the Fristo Case.[108]

### (d) Prepetition Foreclosures, Seizures, and Levies (SOFA Question 10)

Question 10 of the SOFA requires a debtor to disclose if any of the Debtor's property was foreclosed, seized, or levied upon within one (1) year of the bankruptcy filing.[109]  In relation to such inquiry, some of the Debtor's old computers in a storage facility were liquidated in 2020 for non-payment of the storage lessor (collectively, the "**Seized/Liquidated Computers**").[110]

In response to Question 10, the Debtor did not disclose any information with respect to the Seized/Liquidated Computers.[111]

### (e) Property in Storage (SOFA Question 22)

Question 22 of the SOFA requires a debtor to disclosure if the debtor stored any of his property in a storage unit or place other than the debtor's home within one (1) year of the bankruptcy filing.[112]  In relation to such inquiry, as of the Petition Date, the Debtor was renting a

---

[106] *See id.*, at p.4 (Question 9).

[107] *See id.* (response to Question 9).

[108] *See also* Joint Stipulations ¶ 64.

[109] *See* Original SOFA, at p.4 (Question 10).

[110] *See* Joint Stipulations ¶ 87.

[111] *See also* Joint Stipulations ¶ 85.

[112] *See* Original SOFA, at p.8 (Question 22).

storage unit for the purpose of storing papers (collectively, the "**Stored Records**"), and the Debtor was storing a computer server in a specialized IT storage facility (the "**Stored Computer Server**").[113]

In response to Question 22, however, in affirming that none of his property had been stored in a storage unit or place other than the Debtor's home within one year before the Petition Date, the Debtor failed to disclose the Stored Records and Stored Computer Server.[114]

### (f) Business Ownership and Control (SOFA Question 27)

Question 27 of the SOFA requires a debtor to disclose if, within four (4) years of the bankruptcy filing, the debtor owned a business or had any of the following connections to any business: a sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time; a member of a limited liability company (LLC) or limited liability partnership (LLP); a partner in a partnership; an officer, director, or managing executive of a corporation; or an owner of at least 5% of the voting or equity securities of a corporation.[115]

In response to Question 27, the Debtor affirmed that he had not had any ownership interest in any business, and that he had none of the connections described above in relation to any business, in each case within 4 years of the Petition Date.[116]  In other words, he failed to disclose his Equity Interests in the Owned LLCs and Closed Businesses and failed to disclose his relationship to the Managed Companies.[117]

---

[113] *See* Joint Stipulations ¶¶ 86 and 88.

[114] *See* Original SOFA, at p.8 (response to Question 22); *see also* Joint Stipulations ¶ 84.

[115] *See* Original SOFA, at p.9 (Question 27).

[116] *See id.* (response to Question 27).

[117] *See also* Joint Stipulations ¶¶ 50, 57, 60.

### F.    *Sworn Testimony at the First 341 Meeting*

At all relevant times, Shawn K. Brown (the "**Trustee**") served as the trustee of the Debtor's bankruptcy estate.[118]  On September 21, 2021, the Trustee conducted an initial meeting of creditors statutorily mandated by section 341 of the Bankruptcy Code (the "**First 341 Meeting**").   The Debtor and his attorney, Tallini, both appeared at the First 341 Meeting.[119]   Additionally, a representative of the United States Trustee's Office and counsel representing approximately a dozen creditors, including some of the plaintiffs from the prepetition litigation commenced against the Debtor, appeared.[120]  At the commencement of the First 341 Meeting, the Debtor took an oath to testify truthfully.[121]

In response to questioning, the Debtor confirmed that he had had the opportunity to review the Petition and Original Schedules and that everything contained in those filings was true and accurate.[122]  Additionally, he testified that the Original Schedules listed all of his property,[123] and that the only income he had received in 2021 through the Petition Date was $16,994 in unemployment income.[124]  With respect to the Original SOFA, in the face of questioning by the Trustee about business connections, it became clear that the Original SOFA failed to include required business connection information and, thus, the Debtor's counsel indicated that he and the Debtor would need to take another look at matters and possibly amend.[125]

---

[118] Joint Stipulations ¶ 36.

[119] *See* First 341 Meeting Transcript, at pp.1 and 4.

[120] *See id.*, at pp.1-2; *see also* Joint Stipulations ¶ 65.

[121] *See* First 341 Meeting Transcript, at p.4; *see also* Joint Stipulations ¶ 38.

[122] *See* First 341 Meeting Transcript, at p.8.

[123] *See id.*, at p.9.

[124] *See id.*, at p.18.

[125] *See generally id.*, at pp.20-23; *see also* Joint Stipulations ¶ 61.

### G.    The U.S. Trustee Requests a Bankruptcy Rule 2004 Examination

On August 24, 2021, the U.S. Trustee filed an *Agreed Motion for a Rule 2004 Examination of James Varga*.[126]  Pursuant to the motion, the U.S. Trustee requested authority to examine the Debtor and to also compel the Debtor to produce documents.  On September 27, 2021, the Court entered an agreed order granting the U.S. Trustee's motion.[127]  In accordance with the agreed order, the Bankruptcy Rule 2004 examination of the Debtor was scheduled for November 5, 2021.[128]

### H.    The First Amended SOFA

On November 2, 2021, 90 days after the filing of the Original SOFA, 42 days after the First 341 Meeting, and 3 days before the scheduled Bankruptcy Rule 2004 Exam, the Debtor filed an amended SOFA (the "**First Amended SOFA**").[129]  In signing the First Amended SOFA, once again the Debtor verified that "I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that answers are true and correct."[130]

#### (a) Prepetition Income (SOFA Questions 4 and 5)

In the First Amended SOFA, the Debtor restated the same incomplete responses to Questions 4 and 5 as were set out in the Original SOFA.[131]

#### (b) Primary Nature of Debts (SOFA Question 6)

In the First Amended SOFA, the Debtor reaffirmed the same inaccurate response to Question 6 as was set out in the Original SOFA.[132]

---

[126] *See* Exh. UST-10.

[127] *See* Exh. UST-11.

[128] *See id*.

[129] *See* Exh. UST-13 (First Amended SOFA).

[130] *See id.*, at p.15; *see also* Joint Stipulations ¶ 44.

[131] *See* First Amended SOFA, at p.2 (responses to Questions 4 and 5); *see also* Joint Stipulations ¶¶ 78-79.

[132] *See* First Amended SOFA, at p.3 (response to Question 6).

### (c) Prepetition Legal Actions (SOFA Question 9)

In the First Amended SOFA, the Debtor added reference to the Mudd Case and the Frosto Case in his response to Question 9, thereby addressing the deficiency from the Original SOFA.[133]

### (d) Prepetition Foreclosures, Seizures, and Levies (SOFA Question 10)

In the First Amended SOFA, the Debtor reaffirmed the same incomplete response to Question 10 as was set out in the Original SOFA.[134]

### (e) Property in Storage (SOFA Question 22)

In the First Amended SOFA, the Debtor reaffirmed the same inaccurate response to Question 22 as was set out in the Original SOFA.[135]

### (f) Business Ownership and Connections (SOFA Question 27)

In the First Amended SOFA, the Debtor changed his answer of no owned business interests in response to Question 27 to the disclosure of having a membership interest in twenty-one (21) different limited liability companies within four (4) years of the Petition Date.[136]  While the change was material and meaningful, the response continued to omit the disclosure of owned Equity Interests in at least four (4) different Owned LLCs or Closed Businesses.[137]

### I.   Sworn Testimony at the Bankruptcy Rule 2004 Examination

On November 5, 2021, counsel for the U.S. Trustee conducted the Bankruptcy Rule 2004 examination of the Debtor (the "**2004 Exam**").[138]  At the commencement of the 2004 Exam, the

---

[133] *See id.*, at p.5 (response to Question 9).

[134] *See id.*, at p.6 (response to Question 10); *see also* Joint Stipulation ¶ 84.

[135] *See* First Amended SOFA, at p.9 (response to Question 22).

[136] *See id.*, at pp.10-14 (response to Question 27).

[137] Specifically, PWB, WHRH, PWB Development Corp., and PWB Lending.  *See also* Joint Stipulations ¶ 68.

[138] *See* 2004 Exam Transcript; *see also* Joint Stipulations ¶ 40.

Debtor was duly sworn as a witness, whereby he committed to tell the truth and nothing but the truth during the course of the examination.[139]

One of the primary topics of inquiry during the 2004 Exam was the Debtor's prepetition business affairs, including business ownership and business connections. Among other things, noting the new disclosure of 21 entities in response to SOFA Question 27 of the First Amended SOFA, several questions were posed to the Debtor in regards to the Debtor's ownership of entities *as of the Petition Date*. At least four different times, the Debtor professed to hold no ownership interest in any business, confirming that the lack of ownership disclosures within the Original Schedules were accurate.[140]

### J.      The U.S. Trustee Objects to the Debtor's Discharge

On December 21, 2021, the U.S. Trustee timely filed the Complaint to object to the granting of a bankruptcy discharge to the Debtor. In relation to the Bankruptcy Code § 727(a)(4)(A) count of the Complaint (relating to false oaths), the U.S. Trustee specifically highlighted the many inaccurate sworn statements made by the Debtor in relation to his prepetition business activities, including statements with respect to: (i) the nature of the debts owed by the Debtor, (ii) the ownership of business entities, (iii) the existence of business co-debtors, (iv) prepetition business litigation against the Debtor, (v) prepetition business income, and (vi) the location of stored business-related records and a server; asserting that the Debtor knowingly and fraudulently made such false statements under oath. In relation to the Bankruptcy Code § 727(a)(2) count of the Complaint (relating to the concealment of assets), the U.S. Trustee specifically highlighted the non-disclosure of Sparkit! and the Debtor's prepetition business income, asserting

---

[139] *See* 2004 Exam Transcript, at pp.5 and 141.

[140] *See id.*, at pp.18, 43, 49, and 78; *see also* Joint Stipulations ¶ 69.

that, prepetition, the Debtor purposefully concealed such assets with the intent to hinder, delay or defraud his creditors, and that, post-petition, the Debtor purposefully concealed such assets with the intent to hinder, delay, or defraud the Trustee and his creditors.

In response to the Complaint, the Debtor filed *Defendant's General Denial* on January 19, 2022, pursuant to which he denied "each and every allegation of Plaintiff's adversary complaint…."[141]   Thereafter, for over a year, no effort was made by the Debtor to address any of alleged false statements targeted within the Complaint.

### K.    *The Debtor Retains New Bankruptcy Counsel and the Amended Schedules and Second Amended SOFA are Filed*

In May 2022, the Debtor engaged Norred Law, PLLC ("**Norred Law**") to represent him in the adversary proceeding.[142]   On June 8, 2022, Norred Law filed a notice to formally appear in the case on behalf of the Debtor.[143]   Then, on November 17, 2022, the Debtor filed an unopposed motion for leave to file an amended answer,[144] which the Court granted.[145]   Thereafter, on January 19, 2023, the Debtor filed the current Answer.[146]   The parties also presented an agreed amended scheduling order, which the Court entered.[147]

Then, on April 14, 2023, 640 days after the Petition Date, 618 days after the filing of the Original Schedules and Original SOFA, and 479 days after the Discharge Objection Deadline, the

---

[141] *See* Exh. UST-21 (*Defendant's General Denial*).

[142] *See* Docket No. 7 (agreed amended scheduling order with Norred Law reflected as counsel for the Debtor).

[143] *See* Docket No. 9.

[144] *See* Docket No. 10.

[145] *See* Docket No. 14.

[146] *See* Docket No. 15 (Answer).

[147] *See* Docket No. 12.

Debtor, with the assistance of Norred Law, filed amended Schedules (the "**Amended Schedules**")[148] and a further amended SOFA (the "**Second Amended SOFA**").[149]

### 1.    Amended Schedules

Along with the Amended Schedules, the Debtor signed and filed his *Declaration About an Individual Debtor's Schedules*, pursuant to which the Debtor affirmed the following: "[u]nder penalty of perjury, I decare that I have read the summary and schedules filed with this declaration and that they are true and correct."[150]

### (a) Business Ownership (Schedule A/B Question 19)

In the Amended Schedules, the Debtor, for the first time, identified the Equity Interests that he owned in the Owned LLCs.[151]  He also identified for the first time the Equity Interests that he either owned or previously owned in the Closed Businesses.[152]  The Debtor identified the value of all such Equity Interests as $0.[153]

In relation to Sparkit!, while the Debtor included reference to the entity in the Amended Schedules, he disclosed that the entity was "owned by business contact Isabel Y. Portillo; debtor claims no interest."[154]

### (b) Co-Debtors (Schedule H)

In the Amended Schedules, despite the fact that the Debtor continued to list in excess of $13.5 million in claims, and despite the fact that he incurred the majority of such claims through

---

[148] *See* Defendant Exh. I (Amended Schedules).

[149] *See* Defendant Exh. J (Second Amended SOFA).

[150] *See* Amended Schedules (last page).

[151] *See* Amended Schedules, Schedule A/B, at p.6 (response to Question 19).

[152] *See id*.

[153] *See id*.

[154] *See id*.

his real estate businesses, the Debtor continued to disclose no limited liability companies or any other businesses as co-debtors on Schedule H of the Amended Schedules.[155]

### 2.    Second Amended SOFA

In signing the Second Amended SOFA, the Debtor verified that "I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that answers are true and correct."[156]

### (a) Prepetition Income (SOFA Questions 4 and 5)

In the Second Amended SOFA, the Debtor for the first time disclosed income received in connection with his business operations – namely, the 2020 Wages/Commissions and the 2021 Wages/Commissions.[157]  He also accurately stated the full amount of his 2020 Unemployment Income and 2021 Unemployment Income.[158]  The following is a revised summary of the income disclosed within the Second Amended SOFA:

| Period | Wages, Commissions, Bonuses, Tips (Q4) | Operating a Business (Q4) | All Other Sources (Q5) |
|---|---|---|---|
| 1/1/2021 – 7/13/2021 | $16,311.61 | $0 | $28,638.00 |
| 2020 | $27,274.50 | $0 | $19,416.00 |
| 2019 | $135,000.00 | $0 | $0 |

### (b) Primary Nature of Debts (SOFA Question 6)

In the Second Amended SOFA, the Debtor for the first time accurately indicated that the Debtor's debts were *not* primarily consumer debts.[159]

---

[155] *See id.*, Schedule H, at p.1 (response to Question 1).

[156] *See* Second Amended SOFA (last page).

[157] *See id.*, at p.2 (response to Question 4).

[158] *See id.* (response to Question 5).

[159] *See id.*, at p.3 (response to Question 6).

### (c) Prepetition Foreclosures, Seizures, and Levies (SOFA Question 10)

In the Second Amended SOFA, the Debtor reaffirmed the same incomplete response to Question 10 as was set out in the Original SOFA and First Amended SOFA.[160]

### (d) Property in Storage (SOFA Question 22)

In the Second Amended SOFA, the Debtor disclosed for the first time the off-site storage of the Stored Records and Stored Computer Server.[161]

### (e) Business Ownership and Connections (SOFA Question 27)

In the Second Amended SOFA, the Debtor materially changed the disclosures previously added as part of the First Amended SOFA. This time, the Debtor listed only two entities, both of which were identified as an entity in which the Debtor was a member and for which the Debtor was an officer, director, or managing executive during the 4-year period preceding the Petition Date: Sparkit! and Keep Calm, Heavenly Spa LLC.[162] None of the other Owned LLCs, Closed Businesses, or Managed Companies are disclosed.

## DISCUSSION

The federal bankruptcy system is designed to provide the honest but unfortunate debtor with the opportunity to obtain a fresh financial start.[163] As explained by the Supreme Court, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in

---

[160] *See id.*, at p.5 (response to Question 10).

[161] *See id.*, at p.10 (response to Question 22).

[162] *See id.*, at p.12 (response to Question 27).

[163] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[164]

A key component of making peace with one's creditors is the debtor's complete, truthful and timely disclosure of financial information with respect to his assets, liabilities, and financial affairs. The failure of a debtor to timely provide such information in a chapter 7 case hinders the ability of the chapter 7 trustee to fully and effectively administer the bankruptcy estate for the benefit of creditors. Accordingly, some have described the discharge in bankruptcy as a privilege reserved for only those debtors who engage in the bankruptcy process in an honest, forthright and timely manner.[165] For those debtors who fail to do so, the Bankruptcy Code sets out a number of grounds for the denial of a discharge.[166]

### A.    False Statements Under Oath: Section 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code is one such provision, denying a discharge to a chapter 7 debtor if "the debtor knowingly and fraudulently, in or in connection with the case … made a false oath or account."[167] To prevail on an objection to discharge under section 727(a)(4)(A), the plaintiff must prove by preponderance of the evidence that: (1) the debtor made a statement under oath in, or in connection with, the bankruptcy case; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.[168] While the burden of

---

[164] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[165] *See, e.g., In re Tabibian*, 289 F.2d 793, 795 (2nd Cir. 1961) ("a discharge is a privilege granted the honest debtor and not a right accorded to all bankrupts"); *see also United States v. Johnston*, 267 B.R. 717, 722-23 (N.D. Tex. 2001), *aff'd*, 48 Fed. Appx. 917 (5th Cir. 2002).

[166] *See generally* 11 U.S.C. § 727(a)(2)–(a)(7) (grounds for the denial of a discharge in chapter 7).

[167] 11 U.S.C. § 727(a)(4)(A).

[168] *Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016); *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.), *cert. denied*, 534 U.S. 1042 (2001).

persuasion always rests with the plaintiff, once the plaintiff has presented sufficient evidence of misconduct to establish a prima facie case for the denial of a discharge under section 727(a)(4)(A), the burden shifts to the debtor to rebut such evidence.[169]

The U.S. Trustee points to several categories of alleged false oaths made by the Debtor in, or in connection with, the Bankruptcy Case: (1) those with respect to the information disclosed in or omitted from the Petition, the Original Schedules, the CMI Statement, the Original SOFA, and the First Amended SOFA; and (2) the testimony provided by the Debtor at the First 341 Meeting and the 2004 Exam.

### 1.    Statements Under Oath

There is no dispute about the fact that each of the Petition, Original Schedules, CMI Statement, Original SOFA, and First Amended SOFA was signed by the Debtor under penalty of perjury as containing true and correct information.   Because each of the factual statements contained therein was a statement made by the Debtor in, or in connection with, the Bankruptcy Case, such statements satisfy the first element of the U.S. Trustee's § 727(a)(4)(A) objection.

Separately, in the case of the testimony provided by the Debtor at the First 341 Meeting and the 2004 Exam, before providing any testimony, the Debtor was placed under oath.   Thereafter, each of the factual statements testified to by the Debtor was a statement made by the Debtor in connection with the Bankruptcy Case.   Accordingly, these statements also satsify the first element of the U.S. Trustee's § 727(a)(4)(A) objection.

---

[169] *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 696 (5th Cir. 2009) (a party "objecting to the debtor's discharge bears the initial burden of production to present evidence that the debtor made false statements. If the plaintiff establishes a prima facie case, the burden shifts to the debtor to present evidence that he is innocent of the charged offense") (internal citation omitted) (citing *First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 992 (5th Cir. 1983) ("While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case")); *see also Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

### 2.    *Falsity of Statements*

In considering the falsity of statements, it is important to understand that the types of statements subject to evaluation under § 727(a)(4)(A) are not only statements of affirmatively disclosed information, but also omitted statements of information where the disclosure of such information is required.[170]   The Debtor does not challenge the falsity of many of the challenged disclosures.   Instead, he blames his counsel's work product and advice.   For purposes of determining the falsity of disclosures, however, such assertion is irrelevant and will instead be discussed later in connection with the Debtor's intent.

With the foregoing in mind, the Debtor's many false disclosures are categorically detailed below:

<u>Petition</u>.   In the Petition, the Debtor falsely disclosed that his debts were primarily consumer debts.

<u>Original Schedules</u>.   In the Original Schedules, the Debtor falsely stated on Schedule A/B that he owned no interest in any businesses (failing to disclose his ownership of the Equity Interests in the Owned LLCs).   Additionally, he failed to disclose any affiliated business co-debtors on Schedule H, thereby causing his co-debtor disclosures to be false due to incompleteness.

<u>CMI Statement</u>.   In the CMI Statement, the Debtor failed to disclose any of the 2021 Wages/Commissions, thereby causing his income disclosures to be false due to incompleteness.

<u>Original SOFA</u>.   In the Original SOFA: (i) with respect to prepetition income, the Debtor failed to disclose any 2020 Wages/Commissions and 2021 Wages/Commission and he under-reported his 2020 Unemployment Income and 2021 Unemployment Income, thereby causing his income disclosures to be false due to incompleteness; (ii) with respect to the nature of the Debtor's debts, the Debtor falsely disclosed that his debts were primarily consumer debts; (iii) with respect to prepetition legal actions, the Debtor failed to disclose the Mudd Case and Fristo Case, thereby causing the disclosures to be false due to incompleteness; (iv) with respect to prepetition foreclosures/seizures/levies, the Debtor failed to identify the Seized/Liquidated Computers, thereby causing the disclosure to be

---

[170] *See CHP, LLC v. Schwyhart (In re Schwyhart)*, 618 B.R. 793, 810 (Bankr. N.D. Tex. 2020) ("An omission of information requested in a debtor's schedules or statement of financial affairs is an affirmatively false statement that the undisclosed information did not exist") (citing *Gebhart v. Gartner (In re Gartner)*, 326 B.R. 357, 374 (Bankr. S.D. Tex. 2005)).

false due to incompleteness; (v) with respect to property in storage/offsite, the Debtor falsely stated that no property was held in storage/offsite (failing to disclose the Stored Records and Stored Computer Server); (vi) with respect to business ownership and control, the Debtor falsely stated that he owned no interest in any businesses, and held no positions of control with respect to any businesses, during the four years preceding the Petition Date (failing to disclose any of the Owned LLCs, Closed Businesses, and Managed Companies).

*First 341 Meeting*.   During the First 341 Meeting, the Debtor falsely testified that all information set forth within the Petition and Original Schedules was true and accurate, falsely testified that the Original Schedules disclosed all of the Debtor's property, and falsely testified that the only income that he received in 2021 (through the Petition Date) was $16,994 in unemployment income.

*First Amended SOFA*.   In the First Amended SOFA: (i) the Debtor reaffirmed all of the false statements and omissions from the Original SOFA with respect to prepetition income, the nature of his debts, prepetition foreclosures/seizures/levies, and property in storage/offsite; and (ii) with respect to business ownership and control, (x) the Debtor failed to disclose his ownership in 2 Owned LLCs (PWB and WHRH) and 2 Closed Businesses (PWB Development Corp. and PWB Lending), and (y) the Debtor failed to disclose any positions of control with respect to any businesses; thereby causing his business ownership and control disclosures to be false due to incompleteness.

*2004 Exam*.   During the 2004 Exam, the Debtor falsely testified that he did not own any companies and that he did not own any interests in any LLCs or other businesses.

Thus, for each of the identified false statements and omissions noted above, the second element of the U.S. Trustee's § 727(a)(4)(A) objection has been satisfied.

### 3.    Knowledge of Falsity

An objecting party is also required to prove that the debtor knew the statement was false. However, the "complaining party need not prove that the debtor consciously chose to omit or misstate information, only that the debtor knew the truth when the omission or misstatement was made."[171]   With that in mind, the Debtor attempts to deflect attention away from himself by claiming that he relied upon his counsel (Tallini) and accountants to compile relevant information and get the documents right.   The engagement of professionals, however, does not relieve a debtor

---

[171] *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed.Appx. 860, 863 fn.1 (5th Cir. 2004); *see also Neary v. Keylor (In re Keylor)*, Adversary No. 20-04050, 2023 WL 4424784, at *12 (Bankr. N.D. Tex. July 10, 2023).

of the obligation to review all sworn disclosures for accuracy before signing, and it does not in any

other manner grant the debtor an amnesia pass with respect to testimony.

Ultimately, here, the Court simply did not find the Debtor to be credible in claiming that

he did not have knowledge of the true state of affairs as of the time that each of the foregoing false

representations and omissions was made.  Contrary to the Debtor's effort to portray himself as a

poorly-educated, unsophisticated business person at trial, the Court finds that the Debtor had a

demonstrated aptitude for, and knowledge base of, sophisticated financial concepts, as evidenced

by (among other things) his one-time holding of a mortgage broker license and Group 1 health

insurance license, and that he had substantial and lengthy experience within the real estate industry

and with respect to business organizational structuring so as to know exactly what was what in

relation to the real estate empire that he had constructed.

Moreover, it is not lost on the Court that there is a common theme among the information

that the Debtor falsely reported and omitted – the Debtor was clearly attempting to conceal all

business-related information in the Bankruptcy Case in an effort to quickly procure a chapter 7

discharge from of all of his business-related debts before any of his business-related connections

were able to catch up with things and attempt to derail the effort.  In this regard, it is simply not

plausible to believe that the Debtor really did not know that the $13+ million in debt that he owed

was business debt as opposed to consumer debt, that the Debtor did not know that he had received

business-related income in addition to unemployment income during 2020 and 2021, that the

Debtor had no co-debtors after being advised to seek bankruptcy protection on account of the

guarantee and joint business liability obligations that he had and the investor litigation in which he

was embroiled, and most significantly, that the Debtor suddenly contracted amnesia in relation to

all 25 of the Owned LLCs and Closed Businesses with which he had extensive involvement during the 4-year period preceding the Petition Date.

Instead, the Court finds that the Debtor knew exactly what he was doing when he failed to disclose all relevant information in the Pre-Filing Workbook to Tallini and then executed the Petition, the Original Schedules, the CMI Statement, and the Original SOFA with falsely stated and omitted information. Additionally, the Court finds that the Debtor knew exactly what he was doing when he attempted to play dumb in the First 341 Meeting as to the scope of his knowledge base. And later, when business information began to come to light, the Debtor knew exactly what he was doing when he attempted to downplay the significance of his business ownerships and connections in the First Amended SOFA and during the 2004 Exam.

In short, having considered the sworn disclosures, the testimony of the Debtor, and all of the facts and circumstances leading up to the bankruptcy filing and during the Bankruptcy Case, the Court finds that the Debtor knew the truth with respect to each of the previously discussed false statements and omissions at the time that each such false statement or omission was made, thereby satisfying the third element of the U.S. Trustee's § 727(a)(4)(A) objection.

### 4.    *Fraudulent Intent*

An objecting party may prove fraudulent intent by showing either an actual intent to deceive on the part of the debtor or by showing the debtor's reckless indifference to the truth.[172] And while it has been recognized that "a discharge cannot be denied when items are omitted from the schedules by honest mistake,"[173] it has also been recognized that "the cumulative effect of false

---

[172] *Packer*, 816 F.3d at 95; *Sholdra*, 249 F.3d at 382.

[173] *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992); *see also Neary v. Harding (In re Harding)*, Adversary No. 14-03078, 2015 WL 222482, at *5 (Bankr. N.D. Tex. Jan. 14, 2015).

statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."[174]

For all of the reasons articulated above in relation to the Debtor's knowledge, the Court also finds that the Debtor misrepresented and falsely omitted information with the actual intent to deceive.  Specifically, as indicated above, the Court finds that the Debtor intentionally attempted to conceal all business-related information in the Bankruptcy Case in an effort to quickly procure a chapter 7 discharge from of all of his business-related debts before any of his business-related connections were able to catch up with things and attempt to derail the effort.  A few additional comments, however, are worth note.

First, in relation to the Debtor's attempt to blame counsel, while the Court does not acknowledge that Tallini failed to complete any of the filings based upon the information provided by the Debtor in the Pre-Filing Workbook, any such failure on the part of counsel would not have absolved the Debtor of responsibility for signing the filings under the penalty of perjury in any event.  While a debtor's reliance on the advice of counsel may, in certain circumstances, excuse a debtor's failure to make accurate disclosures, such reliance must be reasonable and in good faith and a debtor cannot simply blindly rely upon counsel as an excuse for providing false information or for failing to provide required information.[175]  A "debtor has a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question

---

[174] *Duncan*, 562 F.3d at 695; *see also Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366-67 (Bankr. N.D. Tex. 2010).

[175] *See Schwyhart*, 618 B.R. at 812 (citing *Gartner*, 326 B.R. at 374).

is answered completely in all respects."[176]  Thus, reliance on "the advice of counsel is no defense when it should have been obvious to the debtor that his attorney was mistaken."[177]

Second, with respect to the Debtor's attempt to disclaim responsibility based upon not having sufficient time to adequately consider or investigate the information being disclosed, "[a] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."[178]  A debtor must take the time ti review the information so that he can truthfully and in good faith attest to the accuracy of the disclosures.  Plus, here, the Court rejects the Debtor's suggestion that because he was allegedly rushed by Tallini to sign his bankruptcy filings, the Debtor should be absolved from responsibility for the falsehoods and omissions contained in the filings.  The Debtor executed five different documents under penalty of perjury over an extended period of time that contained incorrect factual disclosures.  Consequently, even if the Debtor was initially "rushed," it is inconceivable that the Debtor's repeated omissions and inaccuracies are mere mistakes.

Finally, the Court is not persuaded by the Debtor's argument that the more fulsome disclosures in his Amended Schedules and Second Amended SOFA should absolve him from responsibility for his previous filings.  The filing of subsequent amended disclosures does not negate previous false statements.[179]  Furthermore, filing amendments only after the trustee and/or creditors confront the debtor with the falsity of prior statements fails to provide support for an assertion that the original statements were made without any fraudulent intent.[180]  Here, the Debtor

---

[176] *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 599 (Bankr. N.D. Tex. 2006) (quoting *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991)).

[177] *Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017).

[178] *Neary v. Peres (In re Peres)*, Adversary No. 05-3768, 2007 WL 2766776, at *7 (Bankr. N.D. Tex. Sept. 18, 2007).

[179] *See Sholdra*, 249 F.3d at 384 (affirming denial of discharge to a debtor who, among other things, amended his schedules after a deposition revealed omissions and inaccuracies).

[180] *Id.*

only amended his SOFA after various misstatements and omissions were called out by the Trustee and creditors, and the Debtor only amended the Schedules after the U.S. Trustee objected to the Debtor's discharge.

Thus, while the Court appreciates the effort undertaken by the Debtor's current counsel to remedy the prior false disclosures, the reality is that the effort was simply too little, too late. In viewing the cumulative effect of the Debtor's false statements and omissions, the pattern that emerges clearly demonstrates, at a bare minimum, a reckless disregard for the truth sufficient to support a finding of fraudulent intent.

For all of these reasons, the U.S. Trustee has satisfied the fourth element of the § 727(a)(4)(A) objection.

### 5.   *Materiality*

The subject matter of a false oath is material, and thus sufficient to bar a discharge, if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.[181]   In the case of fraudulently omitted information, the materiality of the omission is not determined on the basis of the value of the omitted asset or whether the omission was detrimental to a creditor;[182] instead, the materiality of the omission is determined on the basis of the importance of the information at issue to the administration of the estate and bankruptcy case.

Thus, here, because the false oaths at issue involve assets of the estate or bear a relationship to the estate insofar as involving prepetition business interests and business dealings of the Debtor, and because those false oaths involve disclosures mandated by the Bankruptcy Code and

---

[181] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005); *see Beaubouef*, 966 F.2d at 178.

[182] *Beaubouef*, 966 F.2d at 178.

Bankruptcy Rules, they are material for purposes of § 727(a)(4)(A). The Debtor's ownership interests in the business entities, the amount and sources of his income, the storage units, and the state court lawsuits naming the Debtor personally as a defendant all clearly "bear a relationship" to the estate and to the administration of the estate. The administration of the Debtor's estate unequivocally requires an understanding of the Debtor's business entities, the cause and nature of his debts, and the sources and amounts of his income, all of which are impacted by the Debtor's false statements described above. A debtor's full disclosure of his assets and liabilities in his Schedules and full disclosure of his financial affairs in his SOFA are essential to the bankruptcy process because the Schedules and SOFA serve the important purpose of ensuring that adequate information is available for the trustee and creditors without the need for investigation to determine whether the information provided is true.

Accordingly, the U.S. Trustee has satisfied the final element of the § 727(a)(4)(A) objection, and having satisfied all elements of the objection, the Debtor's discharge will be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

**B.      Concealment of Property of the Debtor and/or Estate with the Intent
To Hinder, Delay, or Defraud: Section 727(a)(2)**

Under § 727(a)(2) of the Bankruptcy Code, a debtor will be denied a discharge if, with the intent to hinder, delay, or defraud a creditor, the debtor has concealed property of the debtor within one year prior to the filing of the petition.[183] Additionally and alternatively, under § 727(a)(2), a debtor will be denied a discharge if, with the intent to hinder, delay, or defraud a creditor or the chapter 7 trustee, the debtor concealed property of the estate after the commencement of the bankruptcy case.[184]

---

[183] *See* 11 U.S.C. § 727(a)(2)(A).

[184] *See id.* § 727(a)(2)(B).

Concealment, for purposes of § 727(a)(2), "includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known."[185] Here, the U.S. Trustee alleges that the property concealed by the Debtor was his alleged interest in Sparkit! and the business income he received in 2020 and 2021.

Starting first with § 727(a)(2)(A), the Court did not receive sufficient probative evidence to establish that, prepetition, the Debtor ever concealed any interest that he may have ever owned in Sparkit! or any of his prepetition business income from his creditors. Therefore, the U.S. Trustee's discharge objection under § 727(a)(2)(A) will be overruled.

As for the U.S. Trustee's objection under § 727(a)(2)(B), to prevail on an objection to discharge under § 727(a)(2)(B), the plaintiff must, among other things, show that the Debtor concealed *property of the estate*. Property of the estate includes "all legal and equitable interests of the debtor in property as of the commencement of the case."[186] With that in mind, and having considered all of the evidence presented, the Court finds that the U.S. Trustee has failed to establish that the Debtor owned any interest in Sparkit! as of the Petition Date. Similarly, the Court finds that the U.S. Trustee has failed to establish that the Debtor continued to own any amount of the 2020 Wages/Commissions or 2021 Wages Commissions as of the Petition Date. Thus, because the U.S. Trustee has failed to establish a necessary element of a § 727(a)(2)(B) objection, the U.S. Trustee's discharge objection under § 727(a)(2)(B) will also be overruled.

## *CONCLUSION*

For all of the foregoing reasons, while the U.S. Trustee's objections to discharge under 11 U.S.C. § 727(a)(2) will be overruled, the U.S. Trustee's objection to discharge under 11 U.S.C. §

---

[185] *Id.*

[186] *See* 11 U.S.C. § 541(a)(1).

727(a)(4)(A) will be sustained.  Consequently, the Debtor will be denied a chapter 7 discharge in the Bankruptcy Case.  The Court will separately enter a final judgment in conformity herewith.

# # # END OF MEMORANDUM OPINION # # #